Argued and submitted October 26, 2004, reversed and remanded March 9, 2005

## STATE OF OREGON,
*Respondent,*

*v.*

## STEVEN TORRES,
aka Esteban Chavarria,
aka Steve Chavarria,
*Appellant.*

0106-34934; A120024

108 P3d 69

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals from his convictions for manufacture, distribution, and possession of a controlled substance, ORS 475.992(1), (2), and (4), challenging the denial of his motion to suppress evidence. Specifically, defendant argues that the warrantless entry by police into his house, and then into his garage where a marijuana growing operation was located, was not justified under (a) the "emergency aid" doctrine; (b) the community caretaking statute, ORS 133.033; or (c) a combination of probable cause plus exigent circumstances. We conclude that the warrantless entry into defendant's garage was unlawful. Accordingly, we reverse and remand.

The material facts, as found by the trial court, are undisputed. Shortly before 11:30 on the evening of March 24, 2001, Gresham police received a 9-1-1 call from an anonymous citizen informant. The caller said that she thought that a man had broken into a house across the street. According to the caller, she had spoken with the man while she had been outside smoking cigarettes, and he had remained there for "quite awhile" after she had gone inside—and then she had seen him break and climb through the neighbor's front window.

The caller did not give an exact address, but generally described the house, and said that there was a gray minivan parked in front of the house. The caller did not say whether she believed that the residents were at home. Nor did she report that there had been any noises or signs of activity in the house after the man had broken in.

Officer Justin Pick was the first officer to respond to the call.[1] As Pick approached the location on foot, he heard dogs barking loudly in the area immediately behind the house, which he thought might indicate that "a suspect that may have been related to this incident may have gotten across the street into those yards as well." Pick apparently

---

[1] It appears that the police were able to identify the approximate location through the 9-1-1 tracking system. Although the record does not precisely state the interval between the 9-1-1 call and the arrival of the police, it appears that Pick arrived within five minutes and other officers arrived several minutes later.

did not hear or see anything else that he regarded as suspicious or significant.

Other officers arrived. As they approached the location, a man standing on the porch of a house flagged them down, yelling, "hey it's me, it's just me, I accidentally broke the window." The front door of the house was wide open, and the window immediately next to the front door was broken, with a hole the size of a dinner plate, allowing a person to reach through the hole to open the door. Lights in the house were on, and there was a car parked in the driveway.

The officers took the man, later identified as Ricky Gruetzke, into custody. Gruetzke told them that he had come to the house to visit the owner, an old friend of his; that the owner did not know he was coming, and he did not have a key to the house, so he had accidently broken the window as he was trying to slide it open; and that he had entered the house through the window.[2] However, when asked, Gruetzke could not (or would not) tell the police the name of his "friend," the homeowner. The officers frisked Gruetzke and found no weapons or property that appeared to be stolen. Although Gruetzke was nervous, he did not show any signs of physical exertion or struggle, i.e., he was not "flushed, sweaty [or] excited" and there was no blood on his clothing.

The officers then repeatedly called into the house through the front door, to learn if anyone was inside and, particularly, if anyone was injured. They received no response. As they stood on the front porch, the officers could smell the scent of fresh marijuana and believed that the house likely contained a marijuana growing operation.

The officers then entered the house to search for other suspects and to check on whether residents might have been injured or were otherwise unable to respond. The officers "swept" the living area of the house but found no one. The house had not been ransacked, and there were no signs of struggle or any other evidence of criminal activity. There is no indication in the record as to whether, as they conducted

---

[2] The trial court found that, given the size of the hole in the window, Gruetzke had not crawled through the window but had, instead, reached through the hole in the window to open the front door.

their "sweep," the police found any sign (other than the lights being on) that anyone had been in the house shortly before they arrived.[3]

After looking through the living areas,[4] the officers came, finally, to the door leading from the residence to the garage. One of the officers tried to open that door but it was locked and required a key to open. As the officer tried to turn the doorknob, he heard a noise coming from inside the garage, which coincided with the officer's attempt to open the door. The noise then stopped. The officer could not identify the source of the noise; it was not identifiably human. Because they did not have a key to the door, the officers decided to take it off its hinges. As they did so, they again heard an indeterminate noise.

After the officers removed the door and entered the garage, they found a marijuana growing operation. The noise had been the sound of a transformer switching on the lighting system for the grow operation. Officers remained in the house to secure it and to wait for the owner to return. About an hour later, defendant, who was the owner, entered the house and was arrested.

Defendant was charged with manufacture, possession, and distribution of a controlled substance (marijuana). He filed a motion to suppress, arguing that the officers' warrantless entry into his home was unlawful. The state responded that the entry was lawful under (a) the "emergency aid" doctrine; (b) the "community caretaking" statute, ORS 133.033; or (c) the "probable cause plus exigent circumstances" exception to the warrant requirement.

The trial court denied suppression:

"[The officers] had probable cause to believe a crime had been committed, and there were exigent circumstances

---

[3] For example, the record does not disclose that the police found any appliances (*e.g.*, televisions or computers) on, any beds that appeared to be recently slept in, or any other indications of residential activity that may have been interrupted by the break-in.

[4] The police looked only in areas that were large enough to hold or conceal a person, including closets. They did not open any drawers.

warranting their entry into the house. Those exigent circumstances included that it was 11:30 at night, or closer to midnight by then, I suppose. A window had been broken, a door opened by means of that entry through that broken window, an arm going through the broken window; dogs barking in the area behind the residence, which suggested there might be another person involved or in the area; lights on in the house, a car in the driveway, but nobody responding to the officers' yell into the house to find out what was going on or if there was somebody there. So I think they were entitled to enter to look for someone involved with the burglary, either as a perpetrator or a victim of a crime occurring inside the residence, and their search of the residence was limited to those purposes.

"They then having swept the residential portion of the house, there was an exigency warranting the opening—forcing open of the door between the house and the garage when Detective McGowan heard a sound corresponding in time with his trying to open the door, and although they had already started the process and made the decision, hearing the sound again when they started taking the hinges off reinforced their belief that there was somebody in the garage and they were entitled to go in and look, and look in the areas of the garage where a person making the sound might be found, including behind the black plastic.

"The officers reasonably believed there was an individual in distress and needed their assistance in the garage, or if not in distress and in need of their help, then someone who was involved in the burglary, but more likely than not, it was one or the other, and therefore they were justified in searching as they did."

On appeal, the parties substantially reiterate their arguments before the trial court. We begin with the "emergency aid" doctrine. In *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), we described the four cumulative requirements of that doctrine:

"(1)  The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2)  The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

(Footnote omitted.)

Significantly, for purposes of this case, even if there is an "emergency" sufficient to justify the initial warrantless intrusion, the "emergency" may dissipate in the light of subsequent developments, rendering continued or further intrusion unlawful. *See, e.g., State v. Davis*, 295 Or 227, 240, 666 P2d 802 (1983) (emergency dissipated when victim found safe); *State v. Martofel*, 151 Or App 249, 253-54, 948 P2d 1253 (1997) (emergency based on report of a man with a gun had not yet dissipated at the time that police, in response to that report, discovered a marijuana growing operation in the backyard of the defendant's residence).

■ Although the distinction between the first and second of *Follett*'s requisites remains somewhat unsettled, it appears that, at a minimum, a "true emergency" exists when "the circumstances that gave rise to a reasonable belief that immediate police action was required actually exist[ed]." *Martofel*, 151 Or App at 255 (Haselton, J., concurring). *See also State v. McDonald*, 168 Or App 452, 457, 7 P3d 617, *rev den*, 331 Or 193 (2000) (citing that formulation with approval).

■ In this case, defendant contends that no "true emergency" existed when the officers entered his home and that, in all events, any emergency had dissipated by the time the officers removed the locked door and entered the garage. Because we agree with the latter contention, we need not resolve the former.

Before the police entered defendant's home, they knew, or had probable cause to believe, that Gruetzke had broken into defendant's home and had lied about the reason for his entry. Thus, the police had probable cause to believe that Gruetzke had committed a crime—criminal trespass

and, perhaps, burglary. The police also knew that the lights inside the house were on when they arrived;[5] that there was a car parked in the driveway—which could indicate that someone had been inside the house when the break-in occurred; and that no one had responded to their repeated, shouted inquires. All of those circumstances could support a reasonable belief that one or more occupants had been injured or incapacitated during the commission of a residential burglary and needed immediate assistance.

Other facts known to the officers arguably militated against such a belief. The anonymous neighbor informant had seen only one perpetrator and did not report that any sounds had come from the house after the break-in. The police had a single perpetrator, Gruetzke, in custody, and Gruetzke's account of his actions matched the neighbor's 9-1-1 report. Gruetzke himself had "flagged down" the police. That is, he had brought himself to their attention rather than being apprehended while attempting to hide or flee. Although nervous, Gruetzke showed no signs of unusual exertion or physical struggle. He possessed no weapons or contraband, including stolen property.

At least two other facts known to the officers would reasonably bear on an assessment of whether, in the totality of the circumstances, immediate police action was necessary to protect life or property. First, although Pick had arrived near the house within about 5 minutes of the 9-1-1 call, it appears that roughly 20 minutes elapsed between the call and when the officers entered the house.[6] Second, Pick heard dogs barking loudly, which he believed might indicate the presence of someone in the yards nearby.

In sum, before the officers entered the house, they knew of some circumstances that were indicative of an emergency, others that suggested either that there was no emergency or that the emergency had dissipated, and still others

---

[5] The record does not disclose whether the lights were on in the house throughout or whether some or all of the lights were turned on after the break-in.

[6] The time frame is not entirely clear from the record. Our estimate is based on a review of an exhibit that was a tape of the 9-1-1 call and ensuing police communications.

that were ambiguous. Gruetzke had committed a residential crime, had remained in the house for approximately 20 minutes, and then had lied to the police about his actions.[7] The police also had reason to believe that the house had been occupied when Gruetzke broke in, but no one inside was responding to them. Conversely, there was no explicit evidence that anyone had, in fact, been inside the house when the break-in occurred; Gruetzke himself initiated contact with the police and was in custody; and there was no extrinsic evidence of violence.

Given the totality of those circumstances, the question of whether a "true emergency" existed when the police crossed the threshold is close. We need not resolve that question, however. Even assuming that there was an emergency justifying the initial warrantless entry, that emergency had dissipated before the police removed the door between the residence and the garage and entered the garage.

As noted, after entering the residence and before entering the garage, officers conducted a thorough "sweep" of every room and all spaces, including closets, large enough to hold or conceal a person. They found no evidence of criminal activity, no signs of violence, and no disturbance or ransacking. Further, nothing in the record indicates that, as they conducted their interior residential "sweep," the officers found anything corroborating that the house had, indeed, been occupied when the break-in occurred.

In short, the additional information that the officers gained by the time they came to the locked door between the residence and the garage belied the concerns that underlay the initial warrantless entry. In the places where one would reasonably expect to find some evidence that an intruder had

---

[7] The fact that the officers here actually knew before they entered the house that a residential crime has been committed materially distinguishes this case from several of our decisions that defendant invokes. *See, e.g., State v. Christenson,* 181 Or App 345, 45 P3d 511 (2002) (officers entered house in response to neighbor's report that the defendant's front door was open at 9:20 on a summer morning, the defendant's dogs were running at large, and the neighbor had called in through front door and received no response); *State v. Bramson,* 94 Or App 374, 765 P2d 824 (1988) (open front door in 30-degree temperature, vehicle in driveway, and report of residents being out of town did not give police officers probable cause to believe that a burglary had been or was being committed).

surprised or confronted and assaulted an occupant—if that had, in fact, occurred—there was no such evidence. There was no evidence that an occupant of the house had been injured or incapacitated as a result of the break-in and required immediate assistance.

Any emergency had dissipated by the time that the officers reached the locked door to the garage. *See Davis*, 295 Or at 239-40. The question remains, however, whether the emergency was somehow "revived" when, as an officer attempted to open the locked door, he heard an indeterminate noise coming from inside the garage. We conclude that there was no such "revival" of any emergency.

In so holding, we note three salient facts. First, the door required a key to open from the residential side—which necessarily meant that it had either been locked with a key from the residential side or had been locked from inside the garage. Second, the sound from the garage was not identifiably human—indeed, it was not identifiable at all. Third, although the officers had heard that sound twice—once when turning the doorknob, and the second time while removing the door from its hinges—the noise was not constant or continuous.

Each of those facts must be considered in light of the putative emergency—*viz.*, reasonably, was there an injured or otherwise incapacitated person on the other side of the locked door? Given the lock-and-key arrangement, any helpless person on the other side of the door would have to have been locked *in* by a perpetrator. Thus, the likelihood that there was a helpless victim in the garage corresponded to the likelihood that, after Gruetzke broke in, he somehow (a) forcibly compelled at least one victim into the garage or confronted a victim who was already in the garage at 11:30 at night; (b) at least partly incapacitated his victim(s); (c) somehow locked the keyed door from the residence to the garage; (d) divested himself of any weapon or key he may have employed; (e) eliminated all signs of struggle in the house; and (f) then voluntarily initiated contact with the police while showing no signs of unusual exertion—all within roughly 20 minutes of his entry.

That scenario is not, and was not, plausible—much less rising to the level of "reasonable grounds" necessary to justify a warrantless entry under the "emergency aid" doctrine. Nor did the coincidental occurrence of the indeterminate sounds from the garage so enhance the plausibility of the putative "helpless victim in the garage" as to revive any "true emergency." There was nothing identifiably human about those sounds. Moreover, if those sounds emanated from a partially incapacitated victim, one might reasonably expect that the sounds would have continued to attract the attention of potential rescuers, after the officers initially tried to open the door. But that did not happen. Given those facts—and the range of plausible explanations for indeterminate sounds coming from inside a garage—the occurrence of the sounds was so common and ambiguous that it did not "suggest a reason for concern or lack of concern." *Christenson*, 181 Or App at 351.

We acknowledge that this sort of deconstruction may be easy, perhaps too easy, with the benefit of 20/20 hindsight. Like the trial court, we do not question the officers' motivation and good faith. Nevertheless, in the totality of the circumstances, the facts known to the officers when they removed the door and entered the garage did not support a reasonable belief that the intrusion was necessary to protect life.

For similar reasons, the officers' warrantless removal of the door and entry into the garage was not authorized by the "community caretaking" statute, ORS 133.033. That statute states, in part:

"(1)   Except as otherwise expressly prohibited by law, any peace officer of this state, as defined in ORS 133.005, is authorized to perform community caretaking functions.

"(2)   As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public. 'Community caretaking functions' includes, but is not limited to:

"(a)   The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"(A) Prevent serious harm to any person or property;

"(B) Render aid to injured or ill persons; or

"(C) Locate missing persons.

"(3) Nothing contained in this section shall be construed to limit the authority of a peace officer that is inherent in the office or that is granted by any other provision of law."

In *Christenson*, we explained the scope of ORS 133.033:

"[A]lthough the statute does not require an actual emergency, the need to enter the house must be based on an officer's objectively reasonable perceptions. The subjective beliefs of the officers are not, therefore, dispositive. Further, * * * the statutory community caretaking function is subject to the limitations on warrantless searches contained in Article I, section 9, of the Oregon Constitution. Thus the potential breadth of the statutory community caretaking function is constitutionally circumscribed."

181 Or App at 349 (citations and footnote omitted).

Thus, ORS 133.033 authorizes a warrantless intrusion only if the officers' belief that that intrusion is necessary to "[p]revent serious harm to any person or property" is objectively reasonable, given the circumstances then known to the police. Here, for the reasons described above, by the time the officers reached, and removed, the door to the garage, they did not have objectively reasonable grounds for believing that further intrusion was necessary to assist a helpless or injured victim. Accordingly, ORS 133.033 did not authorize that entry.

We address, finally, whether the officers' warrantless removal of the door and entry into the garage was justified by a combination of probable cause and exigent circumstances. *See generally State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) ("An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence."). The state notes, correctly,

that the officers had probable cause to believe that Gruetzke had committed a crime, and then asserts that

> "[t]he police were faced with a situation where one of two circumstances probably was present: either the homeowner was inside but unable to respond to police beckoning, or an accomplice was inside trying to hide. Time was of the essence if an injured person indeed were there; and it also was of the essence if an accomplice were inside and destroying evidence of the crime. This court held in *State v. Lynch*, 135 Or App 528, 900 P2d 1042, *rev den* 322 Or 362 (1995), that the police had probable cause to believe burglars were in the house based on the neighbor's report of seeing people trying to break in, and those exigent circumstances justified their entry to search for burglars. The same is true here."

For the reasons stated above, we reject the state's arguments that the possible presence of an injured or an incapacitated victim gave rise to an "exigency" sufficient to justify the warrantless of removal of the door and entry into the garage. Regardless of whether such concerns may have been sufficient to support the officers' initial entry, the results of the ensuing "sweep" of the residence dispelled those concerns.

The same is true with respect to the possible presence of an accomplice. We emphasize that, even before entering the house, the police had no information that more than one person had been involved in the break-in. The 9-1-1 caller said that one man had broken in and, when asked if she had seen anyone else, she said that she had not. When Pick arrived, he heard dogs barking, which he thought might indicate the presence of someone outside moving away from the house—"may have gotten across the street into those yards as well." Thus, when the officers arrived at the house and took Gruetzke into custody, they had no objectively reasonable basis to believe that any other perpetrator was still in the house. *Compare State v. Schrag*, 21 Or App 655, 536 P2d 461, *rev den* (1975) (sustaining officers' warrantless entry into house to apprehend suspects in response to neighbor's report that burglary was in progress).[8]

---

[8] *Cf. State v. Lynch*, 135 Or App 528, 532 n 2, 900 P2d 1042, *rev den*, 322 Or 362 (1995) (noting that the defendant had not preserved argument that officers' initial

Nothing in the ensuing "sweep" of the residence indicated otherwise. There was no evidence of criminal activity inside the house, much less evidence that Gruetzke had an accomplice. Given those circumstances and the indeterminate nature of the sounds coming from the garage, any belief that an accomplice had locked himself or herself in the garage was entirely speculative. Accordingly, exigent circumstances did not justify the warrantless removal of the door and entry into the garage.[9]

The trial court erred in denying the motion to suppress.[10]

Reversed and remanded.

---

warrantless entry into his house, in response to neighbor's report of burglary in progress, was not justified by exigent circumstances).

[9] The state argues on appeal, for the first time, that the officers' warrantless intrusion was justified by the exigency that "someone was inside potentially destroying the evidence" of the marijuana growing operation that the officers believed was located somewhere in the house. We decline to address that contention as an alternative basis for affirmance because, if that contention had been timely raised, it might well have materially affected the development of the factual record before the trial court. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (appellate court will address alternative basis for affirmance only if the record is materially "the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below"). We note, parenthetically, that, on this record, there is no evidence that the officers entered the residence or the garage to search for the indoor marijuana growing operation, much less to forestall its imminent destruction.

[10] Given our disposition, which is based on Oregon statutory and constitutional law, we need not address defendant's alternative argument that the search violated the Fourth Amendment to the United States Constitution.