On respondent's petition for reconsideration filed April 19, and response to state's petition for reconsideration filed May 2, reconsideration allowed; former opinion (198 Or App 218, 108 P3d 69) withdrawn; affirmed August 17, 2005

## STATE OF OREGON,
*Respondent,*

*v.*

## STEVEN TORRES,
### aka Esteban Chavarria,
### aka Steve Chavarria,
*Appellant.*

## 0106-34934; A120024

118 P3d 268

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Assistant Attorney General, for petition.

Anne Fujita Munsey, Deputy Public Defender, Office of Public Defense Services, for response.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

Haselton, P. J., dissenting.

**ORTEGA, J.**

The state seeks reconsideration of our opinion in *State v. Torres*, 198 Or App 218, 108 P3d 69 (2005), in which we reversed the trial court's denial of defendant's motion to suppress evidence, on the ground that our opinion failed to accord proper deference to the permissible factual inferences drawn by the trial court. ORAP 6.25(1)(a) (providing that reconsideration may be based on "a claim of factual error in the decision"). As discussed below, we allow the motion for reconsideration, withdraw our former opinion, and affirm the trial court's order denying defendant's motion to suppress.

Defendant appealed his convictions for manufacture, distribution, and possession of a controlled substance, ORS 475.992(1), (2), and (4). His challenge to the trial court's denial of his motion to suppress was based on his contention that the warrantless entry by police into his house, and then into his garage where a marijuana growing operation was located, was not justified under (a) the "emergency aid" doctrine; (b) the community caretaking statute, ORS 133.033; or (c) a combination of probable cause and exigent circumstances. We agreed with defendant and reversed, holding that the officers' warrantless search was not justified. The state now seeks reconsideration, arguing that we failed to properly defer to the trial court's findings regarding noises heard by the officers.

We restate the facts as we described them in our previous opinion:

"The material facts, as found by the trial court, are undisputed. Shortly before 11:30 on the evening of March 24, 2001, Gresham police received a 9-1-1 call from an anonymous citizen informant. The caller said that she thought that a man had broken into a house across the street. According to the caller, she had spoken with the man while she had been outside smoking cigarettes, and he had remained there for 'quite awhile' after she had gone inside—and then she had seen him break and climb through the neighbor's front window.

"The caller did not give an exact address, but generally described the house, and said that there was a gray minivan parked in front of the house. The caller did not say

whether she believed that the residents were at home. Nor did she report that there had been any noises or signs of activity in the house after the man had broken in.

"Officer Justin Pick was the first officer to respond to the call.[1] As Pick approached the location on foot, he heard dogs barking loudly in the area immediately behind the house, which he thought might indicate that 'a suspect that may have been related to this incident may have gotten across the street into those yards as well.' Pick apparently did not hear or see anything else that he regarded as suspicious or significant.

"Other officers arrived. As they approached the location, a man standing on the porch of a house flagged them down, yelling, 'hey it's me, it's just me, I accidentally broke the window.' The front door of the house was wide open, and the window immediately next to the front door was broken, with a hole the size of a dinner plate, allowing a person to reach through the hole to open the door. Lights in the house were on, and there was a car parked in the driveway.

"The officers took the man, later identified as Ricky Gruetzke, into custody. Gruetzke told them that he had come to the house to visit the owner, an old friend of his; that the owner did not know he was coming, and he did not have a key to the house, so he had accidently broken the window as he was trying to slide it open; and that he had entered the house through the window.[2] However, when asked, Gruetzke could not (or would not) tell the police the name of his 'friend,' the homeowner. The officers frisked Gruetzke and found no weapons or property that appeared to be stolen. Although Gruetzke was nervous, he did not show any signs of physical exertion or struggle, *i.e.*, he was not 'flushed, sweaty [or] excited' and there was no blood on his clothing.

"The officers then repeatedly called into the house through the front door, to learn if anyone was inside and, particularly, if anyone was injured. They received no response. As they stood on the front porch, the officers could smell the scent of fresh marijuana and believed that the house likely contained a marijuana growing operation.

"The officers then entered the house to search for other suspects and to check on whether residents might have been injured or were otherwise unable to respond. The officers 'swept' the living area of the house but found no one.

The house had not been ransacked, and there were no signs of struggle or any other evidence of criminal activity. There is no indication in the record as to whether, as they conducted their 'sweep,' the police found any sign (other than the lights being on) that anyone had been in the house shortly before they arrived.[3]

"After looking through the living areas,[4] the officers came, finally, to the door leading from the residence to the garage. One of the officers tried to open that door but it was locked and required a key to open. As the officer tried to turn the doorknob, he heard a noise coming from inside the garage, which coincided with the officer's attempt to open the door. The noise then stopped. The officer could not identify the source of the noise; it was not identifiably human. Because they did not have a key to the door, the officers decided to take it off its hinges. As they did so, they again heard an indeterminate noise.

"After the officers removed the door and entered the garage, they found a marijuana growing operation. The noise had been the sound of a transformer switching on the lighting system for the grow operation. Officers remained in the house to secure it and to wait for the owner to return. About an hour later, defendant, who was the owner, entered the house and was arrested.

"Defendant was charged with manufacture, possession, and distribution of a controlled substance (marijuana). He filed a motion to suppress, arguing that the officers' warrantless entry into his home was unlawful. The state responded that the entry was lawful under (a) the 'emergency aid' doctrine; (b) the 'community caretaking' statute, ORS 133.033; or (c) the 'probable cause plus exigent circumstances' exception to the warrant requirement.

---

"[1] It appears that the police were able to identify the approximate location through the 9-1-1 tracking system. Although the record does not precisely state the interval between the 9-1-1 call and the arrival of the police, it appears that Pick arrived within five minutes and other officers arrived several minutes later.

"[2] The trial court found that, given the size of the hole in the window, Gruetzke had not crawled through the window

but had, instead, reached through the hole in the window to open the front door.

"3 For example, the record does not disclose that the police found any appliances (*e.g.*, televisions or computers) on, any beds that appeared to be recently slept in, or any other indications of residential activity that may have been interrupted by the break-in.

"4 The police looked only in areas that were large enough to hold or conceal a person, including closets. They did not open any drawers."

198 Or App at 220-22.

The trial court denied the motion to suppress and found that the officers had probable cause to believe that a burglary had been committed and that there were exigent circumstances justifying entry into the home to search for a possible victim of the burglary or an accomplice. The trial court also determined that the officers' entry into the garage was justified by the emergency aid doctrine, concluding that,

"having swept the residential portion of the house, there was an exigency warranting the opening—forcing open of the door between the house and the garage when Detective McGowan heard a sound corresponding in time with his trying to open the door, and although they had already started the process and made the decision, hearing the sound again when they started taking the hinges off reinforced their belief that there was somebody in the garage and they were entitled to go in and look, and look in the areas of the garage where a person making the sound might be found, including behind the black plastic.

"The officers reasonably believed there was an individual [who was] in distress and needed their assistance in the garage, or if not in distress and in need of their help, then someone who was involved in the burglary, but more likely than not, it was one or the other, and therefore they were justified in searching as they did."

In our original opinion, we held that the warrantless entry into the garage was not justified under (a) the "emergency aid" doctrine; (b) the community caretaking statute,

ORS 133.033; or (c) a combination of probable cause plus exigent circumstances. *Torres*, 198 Or App at 220. We did not reach the question whether the officers' warrantless entry into the house was lawful. *Id*. at 224. In holding that the emergency aid doctrine did not justify the officers' entry into the garage, we relied on what we termed "three salient facts":

> "First, the door required a key to open from the residential side—which necessarily meant that it had either been locked with a key from the residential side or had been locked from inside the garage. Second, *the sound from the garage was not identifiably human—indeed, it was not identifiable at all*. Third, although the officers had heard that sound twice—once when turning the doorknob, and the second time while removing the door from its hinges— the noise was not constant or continuous."

*Id*. at 227 (emphasis added). We determined that any emergency justifying the officers' entry into the home had dissipated by the time they reached the garage door and that "the coincidental occurrence of the indeterminate sounds from the garage" did not "enhance the plausibility of the putative 'helpless victim in the garage' as to revive any 'true emergency.'" *Id*. at 228. Specifically, we held:

> "*There was nothing identifiably human about those sounds.* Moreover, if those sounds emanated from a partially incapacitated victim, one might reasonably expect that the sounds would have continued to attract the attention of potential rescuers, after the officers initially tried to open the door. But that did not happen. Given those facts—and the range of plausible explanations for indeterminate sounds coming from inside a garage *the occurrence of the sounds was so common and ambiguous that it did not 'suggest a reason for concern or lack of concern.'* [*State v.*] *Christenson*, 181 Or App [345, 351, 45 P3d 511 (2002)]."

*Torres*, 198 Or App at 228 (emphasis added).

■ In its petition for reconsideration, the state argues that our original opinion "failed to give proper weight and interpretation to the noises the officer heard inside the locked garage in its review of the reasonableness of the warrantless entry." The state asserts that the trial court specifically

found the sounds in the garage to be "the sort of noise" associated with a person inside the garage.[1] It contends that, under *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), and *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974), we failed to give proper weight to those factual findings and to the permissible inferences to be drawn from them. We agree.

 Historical facts, as found by a trial court, are binding on review if there is evidence in the record to support them. *Ball*, 250 Or at 487. If findings are not made on all such issues and there is evidence from which such facts could be decided in more than one way, we will draw all permissible inferences and presume that the facts were decided consistently with the trial court's ultimate conclusion. *Id*. Our function is to decide whether the trial court applied legal principles correctly to those facts and permissible inferences. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

Here, our original opinion did contain the facts as found by the trial court. Our rendition of those historical facts was accurate. Where the opinion went astray, however, was in the inferences we drew from those facts. Our discussion of the facts—including two of the "three salient facts" upon which our legal conclusion hinged, 198 Or App at 227— contained factual inferences. Although the inferences we drew were among those that *could* be drawn from the historical facts, they were not the *only* possible inferences from those facts—and they conflicted with permissible inferences drawn by the trial court. *Cf. Ball*, 250 Or at 487 ("If * * * there is evidence from which [the] facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion * * * made

---

[1] The state relies on the following factual findings by the trial court:

"Detective McGowan went to open the door—went from the living area to the garage of the house, and when he tried the door knob, discovered that it was locked. When he tried the door knob, he heard a noise inside the garage. I think that timing is important in this case. He wasn't just standing there and heard noises. He heard noises—he heard a noise coincide with his trying the door handle. They asked Mr. Gruetzke if he had a key to the garage. He said no. Detective McGowan then contacted the supervising officer on the scene * * * and other officers to figure out what they should do with this situation. Detective McGowan believed there was someone in the garage *and that was the sort of the noise*."

by the trial court * * *."). By relying on factual inferences that conflicted with those drawn by the trial court, we committed a factual error that can be corrected on reconsideration. ORAP 6.25(1)(a).

The pivotal factual inference to which we failed to defer involves the significance of the timing of the sounds the police officers heard coming from the garage. The trial court's finding that the timing of the sounds coincided with the officers' attempts to open the door supported the necessary inference (apparent from the court's ultimate conclusion that entry into the garage was reasonable) that the sounds were deliberate in nature. Specifically, the trial court concluded:

> "I think that timing is important in this case. [The officer] wasn't just standing there and heard noises. He heard noises—he heard a noise coincide with his trying the door handle.
>
> "* * * * *
>
> "When the officers began to remove the hinges—pins from the hinges so the door could be taken off in that fashion, Detective McGowan heard the noise again."

The trial court's explicit finding regarding the timing of the noises—which is supported by evidence in the record—leads to the factual inference that the noises sounded as if they were deliberately made by a human being, not simply indeterminate or inanimate noises. That reasonable inference was a factual underpinning to the trial court's legal conclusion that the officers had a reasonable belief that there was a human being inside the garage.

The dissent contends that our reconsideration is based not on *Ball v. Gladden* deference to the trial court's factual findings but on disagreement with our prior opinion's legal conclusion regarding whether the totality of the circumstances justified the warrantless entry into the garage under the "emergency aid" doctrine. 201 Or App at 291-92 (Haselton, P. J., dissenting). What the dissent misses, however, is that some of what our prior opinion stated as "facts" contained inferences. Most significantly, one of the "three salient facts" on which we relied was that "the sound from the

garage was not identifiably human—indeed, it was not identifiable at all." *Torres*, 198 Or App at 227. We even went so far as to state—stretching beyond anything in the testimony—that "the occurrence of the sounds was so common and ambiguous that it did not 'suggest a reason for concern or lack of concern.'" *Id.* at 228. Our inference that "[t]here was nothing identifiably human about [the] sounds," *id.*, although permissible from the historical facts, conflicts with the equally permissible inference that the noises were deliberately made by a person. The trial court's ultimate ruling, particularly in light of its emphasis on the timing of the sounds, indicates that it accepted the latter inference. We are bound by the trial court's factual inference that there was indeed something "identifiably human" about the sounds.

Another of the "three salient facts" on which we relied is that "the door [to the garage] required a key to open from the residential side—which necessarily meant that it had either been locked with a key from the residential side or had been locked from inside the garage." *Id.* at 227. We proceeded from there to draw the following conclusions from that "fact":

> "Given the lock-and-key arrangement, any helpless person on the other side of the door would have to have been locked *in* by the perpetrator. Thus, the likelihood that there was a helpless victim in the garage corresponded to the likelihood that, after Gruetzke broke in, he somehow (a) forcibly compelled at least one victim into the garage or confronted a victim who was already in the garage at 11:30 at night; (b) at least partly incapacitated his victim(s); (c) somehow locked the keyed door from the residence to the garage; (d) divested himself of any weapon or key he may have employed; (e) eliminated all signs of struggle in the house; and (f) then voluntarily initiated contact with the police while showing no signs of unusual exertion—all within roughly 20 minutes of his entry.
>
> "That scenario is not, and was not, plausible—much less rising to the level of 'reasonable grounds' necessary to justify a warrantless entry under the 'emergency aid' doctrine."

198 Or App at 227-28 (emphasis in original). Here again, the only historical fact supporting our analysis was the locked

door of the garage. Everything that followed constituted our inferences from those facts—permissible inferences, but not the only ones possible to draw from the fact of the locked door. Other permissible inferences consistent with the trial court's ultimate conclusion were that an encounter between Gruetzke and the homeowner occurred entirely in the garage (explaining the lack of signs of struggle in the house) and that the door was one that locked automatically on being pulled shut.

Having concluded that we improperly failed to defer to the trial court's factual inferences in our original opinion, we now must address whether appropriate deference alters our original conclusion that the trial court erred in ruling that the officers' entry into the garage was justified under the emergency aid doctrine. The requirements of that doctrine are as follows:

> "(1) The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.
>
> "(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient.
>
> "(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.
>
> "(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

*State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993) (footnote omitted). The emergency aid doctrine is a carefully and narrowly drawn exception to the warrant requirement. *State v. Apodaca*, 85 Or App 128, 132, 735 P2d 1264 (1987). When applied to the warrantless entry of a dwelling, the state must make a strong showing that exceptional emergency circumstances truly existed. *Id.*

In *State v. Jones*, 45 Or App 617, 620-21, 608 P2d 1220, *rev den*, 289 Or 337 (1980), we recognized that the emergency aid doctrine is

> "founded upon the actions of police officers which are considered reasonable under the circumstances that faced the

officer at the time of entry. * * * The inquiry is whether the facts available to the officer would lead a prudent and reasonable officer to see a need for immediate action to protect life or property. *Wayne v. United States*, 318 F2d 205 (DC Cir 1963). When faced with what he reasonably and in good faith believes to be an emergency, an officer's action should not be reviewed with severe judicial scrutiny in light of a hindsight analysis of the evidence. Even if the officer's conclusion that an emergency situation existed is ultimately determined to be erroneous, his actions should be upheld if the circumstances, as they appeared at time of entry, would lead a prudent and reasonable officer to conclude immediate action was necessary."

In our original opinion, we stated that the noises the officers heard coming from the garage were "so common and ambiguous" that they suggested neither a reason for concern nor for lack of concern. *Torres*, 198 Or App at 228. However, that conclusion contradicts the trial court's permissible factual inferences regarding the nature of the noises. Deferring as we must to the trial court's finding regarding the timing of the noises and its reasonable factual inference that the noises sounded as though they had been deliberately made, we now conclude that the officers' assessment that the circumstances presented a "true emergency" requiring immediate action was reasonable.

The circumstances known to the officers suggested that a burglary had just taken place at the house, that an innocent occupant of the house might have been present at the time of the incident, and that such a person might now be in the garage behind a locked door and in need of immediate assistance. First, the 9-1-1 call, the broken window, the open front door, and Gruetzke's questionable explanation for the circumstances[2] all suggested that there had been a burglary at the house. Further, although there was no apparent sign of a struggle, other evidence suggested that an innocent occupant was in the house at the time of the burglary and was a possible victim of the burglary: the incident took place late at night when people tend to be in their homes; lights were on inside the house; and a car not belonging to Gruetzke was in

---

[2] For example, Gruetzke claimed that he was a friend of the resident, but he would not tell the officers the name of his alleged friend.

the driveway. Finally, the apparently deliberate nature of the noises coming from the garage provided the officers with a reasonable basis to suspect that a person was on the other side of the closed, locked door.

As we have held in the context of analyzing questions of probable cause, the officers were not required to explore and eliminate all possible explanations for the circumstances that gave rise to their reasonable belief that there was a true emergency. *See State v. Vantress*, 195 Or App 52, 59, 96 P3d 867 (2004); *State v. Gilmour*, 136 Or App 294, 300 n 7, 901 P2d 894, *rev den*, 322 Or 360 (1995). The alternative explanation for the circumstances that was contained in our original opinion, *Torres*, 198 Or App at 227-28, is just one of those possible explanations. It is not the only one possible.

Under the totality of the circumstances here, the officers' belief that a victim in need of assistance was on the other side of the closed, locked door was reasonable. That belief was the basis of the officers' decision to enter the garage. Further, the officers' suspicion that their entry into the garage would alleviate the perceived "true emergency" was also reasonable. Therefore, we conclude that the officers' warrantless entry into the garage was justified on the basis of the emergency aid doctrine.

We turn to address whether, at the time of hearing the noises inside the garage, the officers were lawfully inside defendant's residence. In our original opinion, our conclusion that entry into the garage was not justified obviated the need to evaluate whether the officers' initial warrantless entry into the residence was justified. *Torres*, 198 Or App at 224. As noted above, in denying suppression, the trial court determined that probable cause and exigent circumstances justified the warrantless entry into the house to search for an intruder or possible victims. We agree.

The police may not search a home without a warrant unless one of the established exceptions to the warrant requirement applies. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). One means of justifying such a search is through probable cause accompanied by exigent circumstances. *Id.*

Under Article I, section 9, of the Oregon Constitution, probable cause exists when an officer subjectively believes that a crime has been committed and that belief is objectively reasonable under the circumstances. *State v. Cardell*, 180 Or App 104, 110, 41 P3d 1111 (2002). In determining whether objective probable cause exists, we look to the totality of the circumstances and the reasonable inferences that may be drawn from those circumstances, but no single factor necessarily is dispositive. *State v. Spruill*, 151 Or App 87, 90-91, 948 P2d 726 (1997). Whether objective probable cause exists is a question of law. *State v. Kappel*, 190 Or App 400, 404, 79 P3d 368 (2003), *rev den*, 336 Or 509 (2004). In addition to probable cause, the state must demonstrate that exigent circumstances justified the warrantless search. Exigent circumstances exist if a situation requires "the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) (citation omitted).

The initial inquiry here is whether the police had probable cause to believe that a burglary had been or was being committed. As we have discussed, the officers were responding to a 9-1-1 call reporting a suspected burglary in the area. The caller reported seeing someone break a window and enter a home.[3] When the officers arrived at the scene, they were approached by Gruetzke, who admitted that the home was not his residence.[4] The door to the residence was partially open and the window next to the door was broken. Based on the totality of the circumstances known to the officers, their subjective belief that a burglary had occurred was objectively reasonable.

The question then becomes whether exigent circumstances existed to justify the entry without first obtaining a warrant. We conclude that, because lights were on inside the

---

[3] We note again that, although the caller reported seeing the individual crawl through a window, the broken window in the present case was not large enough for a person to fit through. Rather, it was the size of a dinner plate, allowing a person to reach through the hole to open the door.

[4] Although Gruetzke provided the officers with an explanation for the circumstances, he did not identify the name of the owner. Thus, his statements to the officers did not mitigate the circumstances indicating that a burglary had taken place.

house, a car not belonging to Gruetzke was parked in the driveway, and the incident took place late at night when people tend to be in their homes, exigent circumstances existed to justify the warrantless entry to search for a potential victim of the burglary or a potential accomplice. *See, e.g., State v. Lynch*, 135 Or App 528, 533, 900 P2d 1042, *rev den*, 322 Or 362 (1995) (where probable cause existed that a burglary was in progress, exigent circumstances justified entry and search into areas that could conceal a burglar).

.Reconsideration allowed; former opinion withdrawn; affirmed.

**HASELTON, P. J.,** dissenting.

I would deny reconsideration.

The thrust of the state's petition is that our original opinion did not give adequate *Ball v. Gladden* deference to the trial court's findings of fact, including necessarily implicit findings. In particular, the state asserts that "[t]he lynchpin of this court's analysis appears to be its mistaken understanding about the sounds the officers heard coming from inside the locked garage."

There was no "mistaken understanding." Our original opinion accurately recited the historical facts regarding how the officers described the sounds and their timing:

> "After looking through the living areas, the officers came, finally, to the door leading from the residence to the garage. One of the officers tried to open the door but it was locked and required a key to open. As the officer tried to turn the doorknob, he heard a noise coming from inside the garage, which coincided with the officer's attempt to open the door. The noise then stopped. The officer could not identify the source of the noise; it was not identifiably human. Because they did not have a key to the door, the officers decided to take it off its hinges. As they did so, they again heard an indeterminate noise."

*State v. Torres*, 198 Or App 218, 222, 108 P3d 69 (2005) (footnote omitted). In holding that the noises from inside the garage did not "revive" any "emergency," we noted three salient facts:

"First, the door required a key to open from the residential side—which necessarily meant that it had either been locked with a key from the residential side or had been locked from inside the garage. Second, the sound from the garage was not identifiably human—indeed, it was not identifiable at all. Third, although the officers had heard that sound twice—once when turning the doorknob, and the second time while removing the door from its hinges—the noise was not constant or continuous."

*Torres*, 198 Or App at 227. That recitation of the facts comported exactly with the record evidence regarding the nature and timing of the noise from inside the garage. When asked what the noise "sound[ed] like," Detective McGowan, one of the investigating officers, testified:

"Heard a noise inside. *Couldn't tell what it was*, because the door was closed, obviously. I couldn't tell, but I heard noise coming from the inside. I heard it once when I initially tried to open the door, and then as we were preparing to take [the] hinges off, we heard the same type of noise from inside."

(Emphasis added.) When specifically asked whether the sound was a "human noise" or a "machine noise," McGowan testified:

"It was a—*I don't know how to describe it*. I can tell you what we found it out to be. It was a transformer apparently kicking on, because we did it after we [got] inside. There was a transformer for a lighting system. *I couldn't tell what it was when I went inside*. I just heard a noise coming from inside the garage."

(Emphasis added.)

The present majority does not purport to identify any misstatement of fact in our original opinion. Nevertheless, the state contends, and the present majority agrees, that our original opinion did not give adequate weight to the trial court's consideration of the timing of the noises and to inferences reasonably to be drawn from that timing. I respectfully disagree. In particular, in our original opinion we carefully explained why, in the totality of the circumstances, those noises did not support an objectively reasonable belief that a person in the garage requested emergency assistance:

"Each of those facts must be considered in light of the putative emergency—*viz.*, reasonably, was there an injured or otherwise incapacitated person on the other side of the locked door? Given the lock-and-key arrangement, any helpless person on the other side of the door would have to have been locked *in* by a perpetrator. Thus, the likelihood that there was a helpless victim in the garage corresponded to the likelihood that, after Gruetzke broke in, he somehow (a) forcibly compelled at least one victim into the garage or confronted a victim who was already in the garage at 11:30 at night; (b) at least partly incapacitated his victim(s); (c) somehow locked the keyed door from the residence to the garage; (d) divested himself of any weapon or key he may have employed; (e) eliminated all signs of struggle in the house; and (f) then voluntarily initiated contact with the police while showing no signs of unusual exertion—all within roughly 20 minutes of his entry.

"That scenario is not, and was not, plausible—much less rising to the level of 'reasonable grounds' necessary to justify a warrantless entry under the 'emergency aid' doctrine. Nor did the coincidental occurrence of the indeterminate sounds from the garage so enhance the plausibility of the putative 'helpless victim in the garage' as to revive any 'true emergency.' There was nothing identifiably human about those sounds. Moreover, if those sounds emanated from a partially incapacitated victim, one might reasonably expect that the sounds would have continued to attract the attention of potential rescuers, after the officers initially tried to open the door. But that did not happen. Given those facts—and the range of plausible explanations for indeterminate sounds coming from inside a garage—the occurrence of the sounds was so common and ambiguous that it did not 'suggest a reason for concern or lack of concern.' *Christenson*, 181 Or App at 351."

*Torres*, 198 Or App at 227-28.

Ultimately, this reconsideration is not about the facts. Nor is it even about *Ball v. Gladden* deference. Rather, where our original opinion and the present majority truly depart is on the *legal* question of whether the totality of the then-known (and uncontroverted) circumstances justified the warrantless entry into the garage under the "emergency aid" doctrine. That is, at the time that the officers entered the garage (after taking the door off its hinges), did the totality of

the circumstances support an *objectively reasonable* belief that "immediate police action was required to protect human life"? As with the determination of "objective probable cause," that determination is a *legal* inquiry.

We may have been right or wrong on that ultimate legal call in our original opinion. Of course, I continue to believe that we were right—but, obviously, this is a close and difficult case, and the Supreme Court (like the able trial judge) may some day reach a different conclusion. The real point is that, however close or difficult the ultimate decision, our opinion did not misstate either the facts (with a *Ball v. Gladden* "gloss") or the applicable law. *See* ORAP 6.25(1)(a), (e).

We dealt fairly with the issues as framed by the parties. Our opinion should stand.