Argued and submitted August 31, 2011, affirmed November 7, 2012, petition for review denied May 16, 2013 (353 Or 562)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# FRANK GRONROSS HUDSON,
aka Frank G. Hudson,
*Defendant-Appellant.*

Multnomah County Circuit Court
061136452; A140356

290 P3d 868

■■■■■■■■■■■

Ryan T. O'Connor, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services. Frank G. Hudson filed the supplemental brief *pro se*.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.*

ORTEGA, P. J.

■■■■■■

---

* Brewer, J., *vice* Rosenblum, S. J.

## ORTEGA, P. J.

After a jury trial, the trial court entered a judgment convicting defendant of two counts of aggravated murder, ORS 163.095, and two counts of first-degree abuse of a corpse, ORS 166.087.[1] On appeal from those convictions, defendant asserts, in three assignments of error, that the trial court erred in denying his motions to suppress.[2] Specifically, defendant argues that the trial court should have suppressed evidence that, in his view, was obtained as a result of the police illegally seizing him, violating his right to counsel, and improperly failing to provide him with *Miranda* warnings. Finding no merit to those arguments, we affirm.

We recount the facts consistently with the trial court's factual findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993) (appellate courts are bound by a trial court's findings of historical fact relating to a defendant's motion to suppress, to the extent that those findings are supported by evidence in the record). On a Sunday morning in November 2006, Washington County law enforcement received reports of a potential homicide scene on Highway 26. Upon arriving at the scene officers found two male bodies in a driveway about 20 feet off the highway. One of the bodies had been dismembered and was missing its limbs and lower torso; much of the skin had also been removed from the upper torso. The other body had not been dismembered but appeared to law enforcement to have been dragged to the location where it was found. An identification card found on the latter victim identified him as David Copeland. A medical examiner at the scene determined that the victims had been shot, stabbed, and also subjected to blunt force trauma. Based on the lack of blood and the position of the

---

[1] The jury found defendant guilty of four counts of aggravated murder, two counts of murder, and two counts of abuse of a corpse. The two guilty verdicts for murder and two of the guilty verdicts for aggravated murder merged into the two convictions for aggravated murder.

[2] We reject without discussion all of defendant's assignments of error raised in his supplemental *pro se* brief. Additionally, we reject without discussion defendant's fourth assignment of error, in which he contends that the "the trial court's process of 'death qualifying' the jury (*i.e.*, excluding potential jurors who expressed opposition to the death penalty) violated" his constitutional rights. *See Wainwright v. Witt*, 469 US 412, 105 S Ct 844, 83 L Ed 2d 841 (1985); *State v. Montez*, 309 Or 564, 608, 789 P2d 1352 (1990).

bodies, law enforcement believed that the homicides had been committed elsewhere and the bodies dumped. Officers also located other evidence, mostly items of clothing, which appeared to have been thrown from a moving vehicle headed east toward Portland on Highway 26.

Based on the identification of Copeland, detectives contacted his ex-wife in Astoria. She, in turn, directed them to Littrell, who had been Copeland's close friend. Littell informed officers that Copeland had rented a room from a man named Francis and that there was another roommate—a 62-year-old man named Frank—who lived with Copeland and Francis and with whom Copeland did not get along. According to Littrell, Francis owned a maroon van. Littrell drove detectives to a particular address on 62nd Street in Portland and identified it as the house where Copeland, Francis, and Frank lived. The maroon van was not in the driveway, and only a dim light could be seen coming from the kitchen.

Two Washington County detectives stationed themselves in a police car directly across the street from the house. Although it was not a marked police car, it had indicia of being a law enforcement vehicle, including a spotlight and the fact that two officers were sitting in the car using a cell phone and a laptop. The detectives were able to learn through computer research that the owner of the house was Francis Weber. They obtained Weber's driver's license photo and thereby identified Weber as the dismembered homicide victim. Given all the information they had, officers believed that the residence would contain evidence relating to the murders and, in fact, might well be the location where the victims were killed.

While detectives were watching the house, it was dark, windy, and raining hard. After they had been stationed in front of the house for some time, a person walked by the police car and attracted the officers' attention. The individual, who had a slender build and wore a black hooded sweatshirt, did not look at the officers as he passed the police car. Although they could not see his face, based on his gait, demeanor, and build, the individual appeared to the officers to be in his thirties or forties, unlike the 62-year-old

roommate identified by Littrell. The detectives momentarily lost sight of the person as he approached the house, but immediately thereafter lights were turned on upstairs and a television set appeared to have been turned on. It also appeared to the detectives that the person was moving about inside the house.

Officers from the Portland Police Bureau arrived and, while the person was inside the house, positioned themselves in locations around the house to ensure that no one else could enter or leave it without being seen. In addition, police set up a command post and officers gathered in a community center nearby. At that point, officers were aware that two of the three residents of the house had apparently been murdered, that the whereabouts of the third resident were unknown, and that a person who did not appear to be the third resident was inside the house.

Believing that there was evidence relating to the murders inside the house and concerned that that evidence was being destroyed and that the third resident might be dead or injured inside, officers determined that they needed to attempt to contact the person inside the house. However, given the brutal violence of the murders, they agreed that it would be unsafe to send officers to the door to attempt the contact. Police investigators had gathered information about telephone numbers that were associated with the house and, at about 11:00 p.m., a detective called the first of those numbers. Although the telephone rang for some time, the call went unanswered. The result was the same when a detective called the second number: Although the telephone rang for some time, no one answered the call. A call to the third number associated with the house was answered by a man who identified himself as Sproul. He informed the detective who called him that he used to live at the house but had moved away.

Concerned that calls to the house had gone unanswered, officers decided that an officer, Defrain, would attempt to contact the person inside the house by performing a "loud hail" over the public address system in a police car. At the same time a detective, Steed, was assigned to begin an application for a search warrant, which police

were concerned would take some time to obtain. Steed went downtown to begin work on the warrant affidavit. At approximately 11:45 p.m., Defrain gave the hail, which was repeated over a period of several minutes: "The occupants of 6738 SE 62nd, this is Portland Police. We need you to come to the front door with your hands up." Defrain observed the person inside the house put his head out of an upstairs window and then go back inside the house. Over the next minute and 20 seconds, Defrain repeated the hail in different ways and added statements indicating that he had seen the person inside the house. During that time, the person again opened and closed the window.

Ultimately, the person, later identified as defendant, opened the front door. Ignoring Defrain's continued instruction to keep his hands up and walk towards police, he instead reached into his pockets and turned back and fumbled with the front door of the house. Eventually, defendant turned from the door and walked toward the officers with his hands up. As defendant walked toward him, Defrain observed and alerted officers around him to a bloodstain on defendant's pants.

At 11:54 p.m., after he walked to Defrain as directed, officers placed handcuffs on defendant. In a casual conversational style, Defrain asked defendant his name and defendant identified himself as "Frank" and asked what was going on. Defrain informed defendant that he was not under arrest, but detectives needed to speak with him. Defendant informed Defrain that he had two roommates, but that there was no one else in the house at that time. Defendant also explained, in response to an inquiry by Defrain regarding what he had done at the front door of the house, that he had gone back to lock the door because "Francis would kill him if he did not lock up the house." Defendant was then asked if he would sit in the patrol car to get out of the rain while waiting for detectives to speak with him and defendant responded that he would not mind doing so. He was then placed inside a patrol car while still wearing handcuffs. Officers then performed a safety check of the house. No observations of any evidence were made at that time, but they were able to confirm that there was no one else inside.

At the same time, another group of police officers had been unsuccessfully searching the area for the maroon van. While heading toward a fast food restaurant for a late dinner at about 12:05 a.m., they happened to drive by a maroon van parked about one mile from the 62nd Street house. They stopped and looked through the windows of the van, observed what appeared to be human remains inside, and immediately notified the lead investigators regarding their discovery.

Just before 12:30 a.m., after the discovery of the maroon van and while it was still raining heavily, the detectives assigned to speak with defendant arrived in front of the 62nd Street house in a police van. The officers, who were in plain clothes and not showing any weapons, instructed defendant to step out of the police car, took him to the police van, and removed the handcuffs. Inside the police van (which, instead of having regular passenger seats, was configured with a table and chairs in the back), officers told defendant that they would like to speak with him. Defendant agreed to speak with the officers, and they told him that they were investigating the disappearance of his housemates and were concerned about possible foul play. They then asked for his consent to search the house. He agreed, indicated that he had no questions about the consent form officers presented to him, and signed it. After doing so, defendant asked if he needed an attorney. One of the detectives responded, "That is up to you." The officer then immediately proceeded to read defendant his *Miranda* rights. After providing defendant with those warnings, the detective asked defendant if he understood his rights, and defendant stated that he did and also signed an advice of rights form. Defendant then agreed to speak with the detectives.

During his conversation with detectives, defendant appeared to be concerned about his roommates. He gave detectives information about them and their living situation, informing them that he had last seen Weber the previous Friday and that Weber had a "purple-ish red" van that defendant had driven three or four months before. Detectives asked if Weber had any enemies who might want to injure him, and asked defendant for his pants size and about his activities on Sunday. Defendant, in response, told them a

couple of stories about Weber's possible enemies, gave them a pants size, and stated that he had been stacking wood on Saturday and had, on Sunday, faxed a time sheet to his employer. He also agreed to allow detectives to look in his wallet, where they found a rent receipt from Weber dated for Saturday.

After conversing for about an hour in the van, the detectives asked defendant if he would be willing to go over to the community center and make a recorded statement because the pounding rain made it hard to hear and impossible to record defendant's statements. Defendant agreed. Officers indicated that they would have allowed defendant to leave at that time if he had asked to do so. Inside the community center the light was much brighter than it had been outside or in the police van, enabling officers to see bloodstains the size of baseballs on both of defendant's knees. In addition, defendant removed his jacket once inside the community center and detectives observed a bandage on his arm, which defendant initially tried to cover. Shortly after officers began recording, defendant again asked if he should have an attorney. One of the detectives again told him that it was up to him. Defendant responded that he did want an attorney, so officers ended the conversation and took defendant into custody.

Pursuant to the consent to search that defendant had signed, another detective began a walk-through of the 62nd Street house at about 3:15 a.m. and observed blood in various areas, including the living room door jamb, the living room carpet, and on the transition strip from the living room into the kitchen. As a result, detectives froze the scene and left the house until obtaining a search warrant about 9:14 that morning.

Defendant filed several pretrial motions to suppress evidence. He contended that he was seized in violation of Article I, section 9, of the Oregon Constitution[3] and the

---

[3] Pursuant to Article I, section 9,

"[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Fourth Amendment to the United States Constitution[4] when Defrain loud hailed him out of the 62nd Street house or, in the alternative, when he was handcuffed and placed in the back of the patrol car. He also argued that the state violated Article I, section 12, of the Oregon Constitution[5] and the Fifth Amendment to the United States Constitution[6] because the police were required to provide him with *Miranda* warnings after they hailed him from his house or, alternatively, when they placed him in the back of the patrol car. Finally, he contended that his right to counsel had been violated because police continued to question him after he asked whether he needed an attorney. Accordingly, he asked that the physical and testimonial evidence later obtained by police be suppressed.

Following a lengthy suppression hearing, the trial court denied defendant's motions, concluding that police had acted reasonably at each turn. Specifically, the court concluded that the loud hail was not a seizure of defendant and was justified by exigent circumstances in any event. The court explained:

"[T]he police know that there is somebody out there who has killed—brutally killed the two individuals. They do not know the whereabouts of the 62-year-old roommate. They have reason to believe that there is evidence associated with this crime and with the victims inside this home. They know there is an individual inside the home, moving about.

"Given just the sheer horrendous violence of the offense, I believe the police officers when they state that they had a conversation about how they were going to approach the home, and that based on the concern—safety concern, based solely on the gravity of the offense, the patrol officers did

---

[4] Under the Fourth Amendment,

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

[5] Article I, section 12, provides, "[n]o person shall be put in jeopardy twice for the same offence [sic], nor be compelled in any criminal prosecution to testify against himself."

[6] Under the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself[.]"

not feel it was safe to approach the home by knocking on the door, and the detectives concurred with that assessment. I think that is a reasonable assessment.

"The police then took the next least onerous approach to trying to secure the scene and get information about what was going on inside the house. When they called two numbers associated with the house, the phone rang. And knowing there was an individual inside the house, nobody answered the phone. I think that also led to then a heightened concerned that the individual inside the house was ignoring any attempt at communication with the house.

"The next step to secure the scene in a reasonable and expeditious manner, and in the way least restrictive, was simply [to] hail the occupants and try to get whoever was in the house out of the house so that they could make some determination of what was going on. * * *

"I just cannot think of another method, short of having—I mean, it just would not make sense to me to require, under that set of circumstances, to require the police to wait for a warrant, knowing these two homicides have occurred, knowing there was a third roommate, who at least at the time they felt was unaccounted for, and knowing this is a potential crime scene, to simply allow somebody to remain inside."

The court also concluded that officers had reasonable suspicion that defendant "was involved in a homicide at the time that he was removed from the home," that police acted reasonably in handcuffing defendant and having him wait in the police car, and that defendant's question regarding whether he needed an attorney did not constitute an invocation of the right to counsel and, in any event, "it was immediately responded to by an advisal of rights." Furthermore, the court determined defendant's statements to law enforcement were voluntary. In addition, according to the trial court,

"even if [defendant's] consent to search the home were deemed involuntary or unconstitutional, the evidence in the home would have been discovered through a lawful, independent, predictable law enforcement investigation. A warrant would have been—even outside of [defendant's] statements, any judge reviewing the information that law enforcement developed, based on the homicide, the location of the victims, where the victims lived, the location of

the van, that a reasonable magistrate would have found probable cause to search the home in question."

On appeal, defendant renews the arguments he made before the trial court. Specifically, he contends (1) that he was unlawfully seized when police hailed him from the house, (2) that he was arrested without probable cause when officers handcuffed him and placed him in the patrol car, (3) that officers violated his rights when they spoke with him before providing him with *Miranda* warnings, and (4) that his question about whether he needed an attorney was an equivocal invocation of his right to counsel and the police did not properly respond to that equivocal invocation.

The state responds that any seizure that police might have effected by hailing defendant through the loudspeaker and ordering him out of the house "was reasonable to prevent the destruction of evidence under the emergency/exigent circumstances doctrine." Furthermore, according to the state, "observation of bloodstains on his pant legs justified formally seizing defendant." With respect to the *Miranda* warnings, the state argues that police did not subject defendant to custodial interrogation without advising him of his rights. In response to defendant's assertions regarding his invocation of the right to counsel, the state contends that defendant's initial question was not an "ambiguous invocation of counsel" and, even if it "constituted an equivocal invocation," detectives responded appropriately. Finally, it is the state's position that, even if police engaged in unlawful conduct, the trial court properly concluded that "police would have inevitably discovered the same physical evidence through proper and predictable investigatory procedures" and that, even if the court improperly admitted defendant's statements after the loud hail, any error was harmless.

With respect to the loud hail, as noted, defendant argues that, when they used the loudspeaker to order him out of the house, police, in effect, entered the house and seized him. The state responds that, based on the circumstances presented, officers would have been justified in physically entering the house to secure the premises. Specifically, the state contends that exigent circumstances required police to act quickly to prevent destruction of evidence relating to

the murders. Additionally, the state asserts that the loud hail did not constitute a seizure of defendant or, in the alternative, that any seizure was reasonable.

We turn first to defendant's assertion that he was unlawfully seized when the officers ordered him to come out of the house with his hands up. A seizure of a person occurs when officers arrest the person or when a police officer temporarily restrains a person's liberty. *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991). A person is seized for purposes of Article I, section 9, "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis omitted). The question of whether a person has been seized for purposes of Article I, section 9, "is a fact-specific inquiry into the totality of the circumstances." *State v. Dahl*, 323 Or 199, 207, 915 P2d 979 (1996) (internal quotation marks omitted). Defendant relies on *Dahl* in support of his assertion that he was seized under the circumstances in this case.

In *Dahl*, the court analyzed whether the defendant was seized when he complied with a police officer's order via telephone to come out of his house with his hands up. 323 Or at 206. There, officers responded to a report of a man waving a gun on the front porch of a house and, upon arriving at the house, saw the defendant come onto the porch. After an officer shouted for the defendant to "come down 'with his hands up,'" the defendant went back inside. *Id.* at 202. A police dispatcher then called the defendant and ordered him to come outside of the house with his hands up. Defendant complied, was determined to be under the influence of intoxicants, admitted to having driven his car and, during a subsequent prosecution for DUII, asserted that police had unlawfully seized him when they ordered him out of the house. *Id.* at 202-03. The court explained that an encounter is a seizure only if an

> "'officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is

whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself [or herself] in a manner that would be perceived as nonoffensive contact if it had occurred between two ordinary citizens.'"

*Id.* at 207 (brackets in *Dahl*) (quoting *Holmes*, 311 Or at 410). The court concluded that the police order to the defendant was not a request and conveyed the message that compliance was required. Furthermore, the order resulted in a restriction of the defendant's freedom of movement. In that case, the court concluded that the seizure was unlawful because officers, in effect, seized the defendant inside his home but there was no exigency or other justification for a warrantless entry into the house. Indeed, the court observed that "the officers 'had no reason to go in [defendant's] house." *Id.* at 208 (brackets in *Dahl*).

In this case, we conclude that officers seized defendant when, using a loudspeaker, they repeatedly ordered him to come out of the house with his hands up. As in *Dahl*, the officers did not make a request; rather, they directed defendant to come out and, when he failed to comply, continued to repeat the order and added that they had seen him inside. Although officers did not formally place defendant under arrest, *see* ORS 133.005(1), they clearly placed a temporary restraint on and, therefore, stopped him inside his home; under the circumstances, when told to come out with his hands up, a reasonable person would believe that his liberty or freedom of movement had been significantly restricted.

That conclusion, in turn, raises two other issues: whether officers had legal justification to seize defendant and whether officers could lawfully enter the house without a warrant. With respect to those issues, we agree with the trial court that police lawfully seized defendant at the time when they ordered him to come out of the house and that exigent circumstances allowed officers to make a warrantless entry into the house. In light of those considerations, we conclude that, although defendant was seized, officers acted lawfully. "A law enforcement officer has reasonable suspicion and, thus, is permitted to stop an individual for an investigation, if the officer can point to specific and articulable facts that gave rise to the officer's suspicion that the individual

committed a crime." *State v. Nguyen*, 176 Or App 258, 262, 31 P3d 489 (2001).

To have reasonable suspicion, an officer "need only form a belief that is objectively reasonable under the totality of the circumstances that an individual has committed a crime and may draw reasonable inferences from the circumstances based on the officer's experience." *Id.* at 263. Here, officers did not know who defendant was, but knew that he had entered a house occupied by two murder victims whose bodies had been found that day. Furthermore, they knew that the van belonging to one of the victims was missing, and defendant had been on foot dressed in dark clothes when he walked by the police car that dark and very stormy night. Defendant did not appear to match the description of the third person who lived inside the house and failed to answer telephone calls placed inside the house, although officers could see him moving around inside. Those facts and the reasonable inferences that could be drawn from them provided reasonable suspicion that defendant was involved in a crime and, therefore, officers could lawfully seize him by ordering him from the house.[7]

Furthermore, contrary to defendant's assertions and in contrast to the circumstances presented in *Dahl*, in this case, police could legally effect a warrantless entry into the house. In particular, exigent circumstances justified such an entry to secure the premises because there was probable cause to believe that a crime had been committed and that evidence relating to it was inside the house and that a need to prevent destruction of that evidence required officers to act quickly.

Warrantless entries are considered *"per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). The Oregon Supreme Court "has recognized the existence of an 'emergency doctrine' exception to the warrant requirement in the context of

---

[7] We discuss separately defendant's alternative argument that he subsequently was unlawfully confined in the police car without probable cause. 253 Or App at 342-43.

investigation of a crime." *Id*. That exception applies when police are faced with "both probable cause to believe that a crime has occurred and an exigent circumstance." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

"[P]robable cause exists when an officer subjectively believes that a crime has been committed and that belief is objectively reasonable under the circumstances. In determining whether probable cause exists, we look to the totality of the circumstances, but no single factor is necessarily dispositive." *State v. Torres*, 201 Or App 275, 288, 118 P3d 268 (2005), *rev den*, 340 Or 308 (2006) (citation omitted). In this case, we easily conclude that police had probable cause to enter and secure the house based on the totality of the circumstances, including crimes that had been committed. Police knew that two men who lived in the house had been brutally murdered, their bodies dumped on the side of the highway and found somewhere other than where they had been killed. Furthermore, evidence found on the highway indicated that someone had thrown bloody clothes and other items from a moving vehicle headed toward Portland, where the house was located, and the maroon van owned by one of the victims was not at the house. Further, the location of the third roommate, who did not get along with one of the victims, was unknown. Under all the circumstances presented in this case, officers had probable cause to enter the house.[8]

Further, we conclude that exigent circumstances existed to support a warrantless entry into the house. "An exigent circumstance is a situation that requires police to act swiftly to prevent danger to life or serious damage of property, or to forestall a suspect's escape or the destruction of evidence." *Stevens*, 311 Or at 126. Here, a person who police believed was not the third roommate had walked past and entered the house and could be seen moving about inside. Although officers did not know what the person was doing inside, they reasonably believed that evidence relating to the murders would be found inside the house and that that evidence was possibly being destroyed. When officers

---

[8] Indeed, defendant acknowledges that there was probable cause for officers to obtain a search warrant "the moment they learned that the victims lived at that house."

attempted to reach the person inside the house by calling two numbers associated with the house, no one answered the telephone even though the calls rang through. Furthermore, Steed, the detective assigned to prepare the search warrant application and affidavit, testified that he worked on those items for approximately nine hours, a period of time that was "pretty close to standard" in a homicide investigation. In such cases,

> "the ones that I recall doing are taking usually between about seven to nine hours by the time you'd gather all the information, do background information, talk to all the people you need to talk to, write the affidavit, review it, spell check it, submit it to the DA for review—or actually submit it to the sergeant, first, for review, then to the DA for revisions. It's a lengthy process."

Under those circumstances, given the need to preserve evidence relating to the murders and the time it would have taken to obtain a warrant, exigent circumstances justified police entry into the 62nd Street house. The exigent circumstances would have justified officers physically entering the house to secure the premises, where they would have encountered defendant. The fact that, as noted by the trial court, officers chose to use a less intrusive procedure in the form of a "loud hail" is not determinative of the issues presented here. Officers in this case properly acted to secure a likely crime scene. Whether they chose to physically enter the house to secure the premises or to accomplish the same goal by simply instructing defendant to come out of the house, officers would have come into contact with defendant. Under the circumstances presented here, their actions were legally permissible.[9]

Defendant next contends that he was arrested when officers handcuffed him and, in any event, when they placed him, in handcuffs, in the back of the patrol car. According to defendant, that arrest violated the state and federal constitutions because it was not supported by probable cause. We disagree. Assuming for purposes of discussion that defendant was arrested when officers handcuffed him, *see State v. Werowinski*, 179 Or App 522, 528, 40 P3d 545 (2002); *State v. Johnson*, 120 Or App 151, 158, 851 P2d 1160

---

[9] We reach the same conclusion under both the state and federal constitutions.

(1993); *State v. Morgan*, 106 Or App 138, 141-42, 806 P2d 713 (1991), such an arrest was supported by probable cause.

Probable cause to make an arrest exists when there is a "substantial objective basis for believing that, more likely than not, an offense has been committed and that the person to be arrested has committed it." *State v. Rayburn*, 246 Or App 486, 490, 266 P3d 156 (2011). "To determine whether the state has established that the facts are objectively reasonable [to establish probable cause], we examine the totality of the circumstances, including the officer's training and experience." *Id.*

Here, as discussed above, defendant, although he did not match the description of the third roommate of the house, entered the residence of two roommates who had been found brutally murdered hours before. The crimes were bloody—one of the victims had been dismembered and the skin removed from part of his torso. A van owned by one of the victims was not at the house. Defendant approached the house on foot and dressed in dark clothes on an evening that was dark, very rainy, and windy. Police believed it likely that the house was a crime scene, and attempted to contact defendant by calling numbers associated with the house. He failed to answer the calls, although they could see him moving around inside. In addition, when officers instructed defendant to come out of the house, he did not immediately comply and was seen putting his head out of the window and then, again, opening and closing the window. When he came out of the house, although officers instructed him to walk toward them and keep his hands up, defendant turned back to the house and fumbled with the door. Finally, and importantly, when defendant did walk to the officers, they could observe what appeared to be blood on his pants. Under the totality of circumstances presented here, the officers had probable cause to arrest defendant when they placed him in handcuffs. Accordingly, we reject defendant's contention to the contrary.

Defendant's remaining arguments relate to police actions after he was in custody. Initially, we address his argument that police "violated [his] right to counsel when they failed to clarify whether his equivocal invocation was intended to be a request for counsel." (Boldface omitted.)

We conclude that officers properly responded to defendant's question regarding whether he needed an attorney and, therefore, we reject his contention on that issue.

"During a custodial interrogation, a suspect has a 'right of assistance of counsel' that 'arises out of his [or her] right against self-incrimination as provided in Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution." *State v. Field*, 231 Or App 115, 122-23, 218 P3d 551 (2009) (footnote omitted; brackets in *Field*) (quoting *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998)). Accordingly, police must cease questioning a suspect in custody who unequivocally invokes the right to counsel. 231 Or App at 123. "However, where the request is equivocal, the police are permitted to 'follow up with questions intended to clarify whether the suspect intended to invoke his [or her] right to counsel.'" *Id.* (brackets in *Field*) (quoting *Meade*, 327 Or at 339). "In either case, the suspect may thereafter waive the right to have counsel present during that or later interrogations." *Meade*, 327 Or at 339.

Here, as noted, near the beginning of his interaction with detectives inside the police van, defendant asked whether he needed an attorney. He now contends that his question was an equivocal invocation of his right to counsel. Assuming that the question did indeed constitute an equivocal invocation of the right to counsel, *see Field*, 231 Or App at 124-25; *cf. State v. Charboneau*, 323 Or 38, 54-55, 913 P2d 308 (1996), officers responded appropriately and defendant subsequently agreed to speak with the detectives. In particular, when defendant asked whether he needed an attorney, the detective informed him that "that was up to him." In other words, he indicated that defendant could make the decision whether to have an attorney or not. Furthermore, the detective immediately followed that statement by informing defendant of his *Miranda* rights both orally and in writing. As part of that advice of rights, the detective informed defendant that he had the right to call an attorney. After stating that he understood his rights, defendant agreed to speak with detectives. Under those circumstances, detectives appropriately responded to defendant's inquiry regarding an attorney, and their

subsequent questioning of defendant did not violate his right to counsel.

Finally, we address defendant's arguments relating to *Miranda* warnings, which relate to two interactions. First, after defendant was handcuffed, Defrain asked his name, informed defendant that he was not under arrest but that detectives needed to speak with him, and asked if there was anyone else in the house and what defendant had done at the front door. Second, after defendant was moved to the police van and the handcuffs were removed, detectives asked defendant for consent to search the house. In both instances, he contends, he was in compelling circumstances and officers interrogated him without providing *Miranda* warnings. The state agrees that, at both times in question, defendant was in compelling circumstances that required *Miranda* warnings before officers could conduct any interrogation. However, it asserts that neither interaction was an interrogation.

Interrogation, for purposes of both state and federal constitutional analyses, consists of either express questioning or words or conduct "that the police 'should know [is] reasonably likely to elicit an incriminating response'; 'incriminating response,' in turn, means any inculpatory or exculpatory response that the prosecution later may seek to introduce at trial." *State v. Scott*, 343 Or 195, 203, 166 P3d 528 (2007) (brackets in *Scott*) (quoting *Rhode Island v. Innis*, 446 US 291, 301 n 5, 100 S Ct 1682, 64 L Ed 2d 297 (1980)).

We turn first to the request for consent to search. On that point, we agree with the state that the request for consent to search did not constitute interrogation and, instead, was merely a request for permission. The likely response, either yes or no, is not incriminating. Rather, as observed by the concurrence in *State v. Vondehn*, 348 Or 462, 489, 236 P3d 691 (2010), the likely and expected answer to a request for permission to search "either gives permission or it does not; the response is neither inculpatory nor exculpatory (although, to be sure, the results of the search can be)." *See also U.S. v. Smith*, 3 F3d 1088, 1098 (7th Cir 1993), *cert den*, 510 US 1061 (1994) ("[C]onsent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation."). Therefore, officers

did not violate defendant's state or federal constitutional rights when they requested his consent to search the house before providing him with *Miranda* warnings.[10]

Similarly, with respect to Defrain's interaction with defendant before putting him in the police car, we conclude that the question regarding defendant's name was not interrogation. Officers did not know who defendant was, only that he had been inside the house but did not match the description of the third roommate who lived there. Asking defendant his name was not a question likely to elicit incriminating evidence and was therefore permissible. In any event, with respect to that question as well as Defrain's other two inquiries—whether there was anyone else inside the house and what defendant had been doing at the door of the house—even assuming those questions did constitute impermissible interrogation and it was error to admit the statements, any error in admitting defendant's responses was harmless. In other words, there was little likelihood that any error affected the verdict. *See* Or Const, Art VII (Amended), § 3; *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In response to the questions at issue, defendant informed officers that that his name was Frank, that his roommates were not at home, and that he had locked the door because "Francis would kill" him if he failed to do so. Those statements were not particularly incriminating and, in view of the evidence presented at trial, were unimportant. At trial, the state presented significant DNA evidence, which was found in the residence, Weber's van, and in the clothing and debris that had been scattered along the highway, linking defendant to the homicides. In view of that and all the other evidence presented to the

---

[10] Furthermore, we note that, even if the request for consent to search was impermissible, the physical evidence in the house would inevitably have been discovered. The inevitable discovery doctrine applies when the evidence in question "would have been discovered, absent [any] illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985) (citing *Nix v. Williams*, 467 US 431, 104 S Ct 2501, 81 L Ed 2d 377 (1984)). Here, as we have discussed, police had probable cause to enter the house before they ever contacted defendant and had begun working on an application for a search warrant. Under the circumstances, we agree with the trial court's conclusion that a warrant would have been issued based on all the information police obtained without defendant—"the location of the victims, where the victims lived, the location of the van." Accordingly, the evidence inside the house would have been discovered by proper and predictable police investigation.

jury, defendant's responses to Defrain had no likelihood of affecting the verdict. Accordingly, their admission, even if error, was harmless.

In view of the foregoing, the trial court properly denied defendant's motions to supress.

Affirmed.