Argued and submitted August 21, 2013, reversed and remanded July 2, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TIMOTHY JOSHUA LANGE,
*Defendant-Appellant.*

Washington County Circuit Court
C110174CR; A148987

329 P3d 797

Jonah Morningstar, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Attorney-in-Charge, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Douglas F. Zier, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

In this criminal case, defendant appeals a judgment convicting him of unlawful possession of heroin, ORS 475.854. He assigns error to the trial court's denial of his motion to suppress evidence obtained during an encounter that defendant contends was an unlawful seizure. Specifically, defendant argues that he was unlawfully seized when the police ordered him to leave a cafe restroom without reasonable suspicion of criminal activity. We reverse and remand.

We review a trial court's denial of a motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We are bound by the trial court's findings if there is sufficient evidence in the record to support them. *Id.* If the trial court did not make findings of historical facts on all pertinent issues and there is evidence from which such facts could be decided more than one way, we presume that the facts were decided in a manner consistent with the court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In accordance with that standard, the facts are as follows.

Beaverton Police Officer Juilfs responded to a 9-1-1 call at a cyber cafe. When Juilfs arrived, he spoke to the cafe manager who had placed the call. The manager told Juilfs that defendant had come into the cafe and purchased 30 minutes of Internet time, but then had left the cafe without using a computer. A few minutes later, defendant had returned to the cafe and immediately had gone into the restroom. The cafe's restroom was a single-occupancy bathroom with a lockable door. The cafe manager had heard banging and moaning sounds coming from the restroom and became concerned that defendant was ill or might need medical attention, which prompted him to call 9-1-1. The manager told Juilfs that defendant had been in the restroom for approximately 15 minutes by the time Juilfs had arrived at the cafe. The manager had not attempted to contact defendant, to ask defendant about his condition, or to ask defendant to leave the restroom.

Before acting on the manager's concerns, Juilfs waited for his cover unit to arrive. While Juilfs waited, he

approached the restroom, which he testified was locked, and, without announcing his presence, listened to what defendant was doing inside. Juilfs heard what he described as a "constant level of noise in the bathroom," including sounds of water running in the sink, a male voice clearing his throat several times, and "some kind of banging and rustling noises." Juilfs testified that what he heard did not sound like someone using the toilet.

Juilfs had been listening for approximately five minutes when his cover unit arrived. Then, Juilfs "started banging" on the restroom door and said, "Beaverton Police, we need you to step out." Defendant responded that he was coming to the door, and approximately one minute later defendant opened the door and stepped out of the restroom. Juilfs testified that defendant "seemed unsteady on his feet as he walked out" of the restroom and that he was "kind of argumentative" when he asked why the police were there. Juilfs moved defendant away from the restroom and directed him into the lobby of the cafe so that they could have a safe place to talk.

In the lobby, defendant continued asking why the police were there and what the problem was. In response, Juilfs asked defendant why he had been in the restroom for such a long time. Defendant responded that he felt sick and had "explosive diarrhea." Juilfs became concerned that defendant had been using drugs in the bathroom, and, as a result, Juilfs asked defendant whether he had any hypodermic needles or weapons on him. Defendant responded that he did not, but Juilfs conducted a patdown of defendant and discovered a pocketknife.

Then Juilfs asked defendant whether he could search defendant's pockets. Defendant responded that he could not. Because he was concerned that defendant might have a hypodermic needle on him, Juilfs placed defendant in handcuffs but told him that he was "not under arrest." Juilfs then left defendant with another officer while he searched the restroom. Juilfs found a small tied-off balloon in the trashcan that had been torn in half, which he identified as a bindle commonly used to transport heroin.

Juilfs returned to defendant and gave him his *Miranda* warnings. Although defendant denied using heroin, Juilfs was nevertheless "convinced" that defendant had been using heroin in the bathroom based on his observations of defendant, including that defendant had been unsteady on his feet, his voice had become raspy and lost volume as he spoke, and he was struggling to keep his eyes open. Juilfs decided to take defendant to Hooper Detox, a detoxification facility.

Before placing defendant in his patrol car, Juilfs searched defendant's pockets and discovered a small bindle similar to the one found in the bathroom. Juilfs also discovered a hypodermic needle and a kitchen spoon commonly used for cooking heroin, which had heroin residue on it. Later testing of the contents of the bindle revealed that it contained heroin. Defendant was charged by information with one count of unlawful possession of heroin, ORS 475.854.

In a pretrial motion, defendant moved to suppress all evidence obtained and statements made during the encounter, citing Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The trial court held a hearing, at which only Juilfs testified. At that hearing, the state argued that the officers were authorized under ORS 430.399(1)[1] to take defendant to the Hooper Detox facility, and that the search of defendant before transporting him was lawful because it was made pursuant to the inventory policy contained in the Beaverton Police Department's General Order. Additionally, the state

---

[1] That subsection provides:

"Any person who is intoxicated or under the influence of controlled substances in a public place may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. A person shall be deemed incapacitated when in the opinion of the police officer or director of the treatment facility the person is unable to make a rational decision as to acceptance of assistance."

ORS 430.399(1). Other portions of ORS 430.399 were amended after the incident at the cafe in early 2011; those amendments do not pertain to our analysis. *See* Or Laws 2011, ch 673, § 30.

argued that defendant was "not constitutionally stopped when he walked out of the bathroom, even if he's physically stopped. The officers were there looking into—checking on his welfare," and that any stop of defendant in this case was based on a reasonable suspicion that defendant had committed a crime.

In reply, defendant argued that he was unlawfully stopped *before* he was placed in detoxification hold. He asserted that the officers lacked reasonable suspicion to stop him and frisk him and lacked probable cause to arrest him, which he argued had occurred when they handcuffed him. Defendant contended that, before he was handcuffed, the only facts known to the officers were that defendant behaved oddly and refused to consent to a search. Citing *State v. Lavender*, 93 Or App 361, 762 P2d 1027 (1988), defense counsel argued that those facts were insufficient to satisfy the state's burden and, accordingly, everything that occurred after each of those stops should be suppressed.

The trial court denied defendant's motion to suppress, reasoning:

"I think the officer did have reasonable suspicion in the beginning when he was listening in the bathroom there. The 15 minutes of time in the bathroom and then when he came out, he was unsteady on his feet.

"And just the progression of the events clearly indicate to me that the officer could reasonably come to the conclusion that he was under the influence of heroin, based upon the officer's opinion that he stated and the factors that he stated and the officer's experience.

"So—And then under the General Order there's a requirement that he take him to a treatment facility, along with * * * [ORS 430.399]. And I think that the officer complied with the statute. So the motion to suppress will be denied."

Defendant was convicted after a trial on stipulated facts; this timely appeal followed.

On appeal, defendant's main argument is that he was illegally seized in violation of Article I, section 9, of the Oregon Constitution when the officer ordered him out of the

restroom without reasonable suspicion that defendant was committing, or had committed, a crime.[2] Defendant contends that a reasonable person, having just been ordered to exit a restroom by a Beaverton Police Officer, would believe that he was not free to ignore the officer's order and remain in the restroom.

The state responds that Juilfs's statement to defendant that the police needed him to come out of the restroom was not a "stop" requiring reasonable suspicion. According to the state, Juilfs's statement did not unlawfully interfere with defendant's liberty because it was not "conduct significantly beyond that accepted in ordinary social intercourse," *Ehly*, 317 Or at 79, and it was precisely what the cafe manager had a right to do himself. The state also argues, citing *State v. Baker*, 154 Or App 358, 961 P2d 913, *rev den*, 327 Or 553 (1998), that the directive for defendant to come out of the restroom was mere conversation. We disagree and conclude instead that defendant was stopped when Juilfs ordered him to leave the restroom.

Article I, section 9, of the Oregon Constitution provides, as relevant here, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Though encounters between the police and citizens are of "infinite variety," *State v. Holmes*, 311 Or 400, 406, 813 P2d 28 (1991), the Supreme Court has pinpointed "three general categories of encounters and described whether or when those encounters implicate the protections afforded to individuals under Article I, section 9":

"First, 'mere conversation' or a 'noncoercive encounter' between an officer and a citizen that involves no restraint of liberty requires no justification and does not implicate the liberty protections provided in Article I, section 9. Second, a temporary restraint of a person's liberty for the purpose of criminal investigation—*i.e.*, a 'stop'—qualifies as a 'seizure,' under Article I, section 9, and must be justified by a

---

[2] Defendant also renews his arguments that, at various points after he left the restroom, his constitutional rights were violated. Because we conclude that defendant was unlawfully seized when Juilfs ordered him to exit the restroom, we need not reach those arguments.

reasonable suspicion of criminal activity. Third, an arrest also is a 'seizure,' under Article I, section 9, and that degree of restraint must be justified by probable cause to believe that the person arrested has committed a crime."

*State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010).

"What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013) (quoting *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)). "The test is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Id.* (citing *Ashbaugh*, 349 Or at 316). The court in *Backstrand* explained that that test cannot be distilled to a question of whether a reasonable person would feel or believe that he or she is "free to leave." 354 Or at 402 n 11. Instead, the test "requires a show of authority by an officer that would cause a reasonable person to believe that the officer intentionally and significantly has restricted, interfered with, or otherwise deprived the citizen of the citizen's liberty or freedom of movement." *Id.* Because encounters between police and citizens are so diverse, the inquiry of whether a person has been seized is a fact-specific question based on the totality of the circumstances of the particular case. *Ashbaugh*, 349 Or at 309-10 (citing *Holmes*, 311 Or at 408).

With those general principles in mind, the question we are faced with is whether a reasonable person in defendant's position would believe that a police officer intentionally and significantly has restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement when the officer identifies himself as a police officer, bangs on a restroom door, and tells the individual that the police need him or her to exit a restroom. For the reasons that follow, we conclude that a reasonable person would so believe.

Instructive are the Oregon Supreme Court's decision in *State v. Dahl*, 323 Or 199, 915 P2d 979 (1996), and our decision in *State v. Hudson*, 253 Or App 327, 290 P3d 868 (2012), *rev den*, 353 Or 562 (2013), which both dealt with a situation in which the police ordered a defendant to step outside a house. In *Dahl*, the court considered whether the defendant had been constitutionally seized when police ordered him to exit his house. In that case, the defendant was on the front porch of a house, and an officer shouted for him to come down "with his hands up." 323 Or at 202 (internal quotation marks omitted). The defendant instead went back inside the house. Then, at the request of the officer, a police dispatcher telephoned the defendant and ordered him to come out of the house with his hands up, and the defendant complied. *Id.* The police later searched both the defendant and his house and discovered evidence that he had been driving under the influence of intoxicants. *Id.* at 203. The defendant later moved to suppress evidence derived from his compliance with the order, arguing that he had been unlawfully seized inside his house when he complied with the police's order to come out with his hands up. *Id.*

The Supreme Court agreed with the defendant, and concluded that the defendant had been seized under Article I, section 9, when the police ordered him to come out of the house with his hands up. *Dahl*, 323 Or at 207. The court explained that the police order to the defendant "was not a request," but "[r]ather, it conveyed a message that compliance was required" and "was intended to and did result in a significant restriction of defendant's liberty or freedom of movement." *Id.* The court further noted that the encounter could not be characterized as voluntary or consensual but, rather, was "confrontational and coercive" because the officers engaged in conduct that left the defendant with no choice in the matter. *Id.* Specifically, the court said that "[t]he police had, in effect, announced to defendant that (1) he was not at liberty to go about his business and ignore their order to come out of his house 'with his hands up,' and (2) he did not have the right to refuse to comply with that order." *Id.* Accordingly, the court concluded that "a seizure of defendant's person occurred while he was still in his house,

and when defendant commenced to comply with the police order." *Id.* at 208. In considering whether that seizure was justified, the court, without expressly stating so, analyzed the seizure as an arrest and concluded that the seizure was unlawful because it was not supported by a warrant, probable cause, or exigent circumstances. *Id.*

In *Hudson*, we considered whether a defendant was seized when the police, over a public address system in a police car, ordered the defendant to exit a house. In that case, the defendant was in a house and was suspected to be involved in a series of gruesome murders. The police had attempted to call phone numbers associated with the house but were unsuccessful in reaching the defendant inside. Accordingly, they decided to attempt to contact the defendant by giving a "loud hail" over the public address system: "The occupants of [the house], this is Portland Police. We need you to come to the front door with your hands up." 253 Or App at 332. The police repeated that hail over a period of several minutes. *Id.* Eventually, the defendant stepped outside of the house and was later charged in connection with the murders. The trial court denied defendant's motion to suppress subsequently discovered evidence derived from his seizure by police, and he appealed, arguing that the evidence should have been suppressed because he had been unlawfully seized when the officer hailed him out of the house. *Id.* at 334-35.

We held that, like the defendant in *Dahl*, the defendant in *Hudson* had been seized when the police, using a loudspeaker, repeatedly ordered him to come out of the house with his hands up. *Hudson*, 253 Or App at 339. We explained that, like the order given in *Dahl*, the order in that case was not a request, but, rather, directed the defendant to come out, and, when the defendant failed to comply, the officers repeated the order. *Id.* at 339. Under those circumstances, we concluded that "a reasonable person would believe that his liberty or freedom of movement had been significantly restricted" and, therefore, that the defendant was seized. *Id.* However, unlike the court in *Dahl*, we characterized that seizure as a "stop," not an arrest, explaining that the officers did not formally place the defendant under

arrest, but they "clearly placed a temporary restraint on and, therefore, stopped [the defendant] inside his home[.]" *Id.* at 339. Accordingly, we analyzed whether the officers had reasonable suspicion to stop the defendant and whether the officers could lawfully enter the house without a warrant, ultimately concluding that both reasonable suspicion and exigent circumstances justified the seizure of the defendant. *Id.* at 339-42.

We conclude that, like the defendants in *Dahl* and *Hudson*, defendant in this case was seized when Juilfs directed him to step out of the restroom. As in *Dahl* and *Hudson*, the officer's order in this case was not a request, but was a direction to defendant to come out of the restroom accompanied by "banging" on the door. And, like the defendant in *Hudson*, although Juilfs did not formally arrest defendant, he did place a temporary restraint on defendant's liberty and, therefore, stopped defendant inside the restroom. Thus, Juilfs conveyed to defendant that he was "not free to terminate the encounter or otherwise go about his *** ordinary affairs." *Backstrand*, 354 Or at 401-02. Under those circumstances, a reasonable person in defendant's position would have believed that his or her liberty or freedom of movement was intentionally and significantly restricted, interfered with, or deprived by Juilfs.

We are not persuaded by the state's reliance on *Baker* in its argument that the officer's directive in this case was not a "stop" but was "mere conversation." In *Baker*, a police officer had seen the defendant, a person the officer knew to be a drug user, leave a known "crack house." 154 Or App at 360. The officer approached the defendant and asked, "So Craig, did you buy any good crack in there?" *Id.* (internal quotation marks omitted). The defendant later moved to suppress evidence, arguing that he was "stopped" when the officer asked him that question. *Id.* The trial court agreed, and granted the defendant's motion. *Id.* at 361. On appeal, we reversed, concluding that the officer merely asked the defendant a question and did not announce to the defendant that he had seen him breaking the law, which amounted to "mere conversation." *Id.* at 362. In this case, however, Juilfs did not merely ask defendant a question about what he was

doing. Rather, Juilfs banged on the door, identified himself as the police, and gave defendant an order: "Beaverton Police, we need you to step out." That directive cannot be fairly characterized as "mere conversation" because, through the imposition of a show of authority, it restrained defendant's liberty of movement by directing him to exit the restroom and effectively announced that defendant was not at liberty to go about his business and remain inside. Like the order in *Dahl*, Juilfs engaged in conduct that, "in effect, deprived defendant of any choice in the matter." 323 Or at 207.

We recognize that the officers' statements in *Dahl* and *Hudson* included an order to "come out with your hands up" and that the order given in this case lacked that additional directive. However, we conclude that the fact that the officer's order in this case did not include an instruction to exit "with your hands up" does not preclude this encounter from being a stop. The absence of an order to come out with "hands up" does not change the nature of the order given to defendant from a mandatory directive to a socially accepted request. Here, the officer identified himself as the police and, under the auspices of that authority, pounded on the restroom door and told defendant that the police needed defendant to come out of the restroom. Even absent the inclusion of an order to exit with his hands up, the order given in this case involved a show of authority sufficient to impose a restraint on defendant's liberty, such that a reasonable person in defendant's position would not have felt that he or she could have ignored the order.

We are also not persuaded by the state's argument that, because the cafe manager could have asked defendant to leave the restroom, Juilfs's order to do the same was not a stop and was not conduct significantly beyond that accepted in ordinary social intercourse. We conclude that, despite the fact that the manager could have asked defendant to exit the restroom, the fact that Juilfs, acting as a police officer and identifying himself as such, directed defendant to come out while banging on the door takes this out of the realm of "ordinary social intercourse" and represents a sufficient show of authority to constitute a seizure under Article I, section 9.

Our conclusion that defendant was stopped when Juilfs ordered him to step out of the restroom raises the questions whether that stop was legally justified and, given the state's argument in this case, whether the officer could have lawfully entered the restroom without a warrant. In regard to whether the stop was legally justified, the state on appeal concedes that, at the time the police contacted defendant, they did not have reasonable suspicion that defendant had committed a crime. We agree.

An officer's stop of a defendant must be supported by reasonable suspicion of criminal activity. *State v. Mitchele,* 240 Or App 86, 90, 251 P3d 760 (2010). Reasonable suspicion requires both a subjective belief by the officer that the person being stopped is involved in criminal activity and that that belief is objectively reasonable. *Id.* at 90-91. Here, Juilfs did not testify to a belief that, at the time he directed defendant to exit the restroom, he suspected defendant of criminal activity. Nor would such a belief have been objectively reasonable in these circumstances. The only facts known to Juilfs at the time the directive was given was that defendant was a paying customer of the cafe, he had been in the restroom for approximately 20 minutes, he had been making banging noises, using the sink, and clearing his throat. Those facts do not give rise to an objectively reasonable belief that defendant had committed, or was committing, a crime when Juilfs stopped him.

The state argues, however, that Juilfs's actions were authorized under the community-caretaking statute, ORS 133.033, and the emergency-aid doctrine. According to the state, Juilfs was responding to the manager's 9-1-1 call to perform a community-caretaking function under ORS 133.033. That statute authorizes a peace officer to perform "community caretaking functions," defined as "any lawful acts that are inherent in the duty of the peace officer to serve and protect the public," including, as relevant here, "[t]he right to enter or remain upon the premises if it reasonably appears to be necessary to" prevent serious harm to persons or property or to render aid to injured or ill persons. ORS 133.033(2).[3] The state contends that, because Juilfs

---

[3] Another portion of ORS 133.033 was amended in 2011; that amendment has no bearing on this case. *See* Or Laws 2011, ch 506, § 9.

was authorized under ORS 133.033 to *enter* the restroom, his statement to defendant that the police needed him to come out of the restroom was inherent in that authority and, therefore, was permissible under ORS 133.033.

The state also argues that Juilfs's actions were permissible under the emergency-aid exception to the warrant requirement. The state contends that, under that exception, police officers may "render aid to a person or to prevent the immediate threat of serious personal injury or harm." *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011). In this case, the state argues, the fact that Juilfs heard unusual noises from the restroom and knew that defendant had been in the restroom for an unusual length of time gave Juilfs reasonable grounds to believe that his assistance was needed.

We conclude that neither the community-caretaking statute nor the emergency-aid exception authorized the officer's actions in this case. First, we pause to reiterate the rules regarding the community-caretaking statute. As we explained in *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009), ORS 133.033 is expressly limited and authorizes only "'*lawful* acts that are inherent in the duty of the peace officer to serve and protect the public.'" (Quoting ORS 133.033(2) (emphasis in *Martin*)). That statute, therefore, does not create an independent exception to the warrant requirement. *Id.* Thus, unless an action taken pursuant to the community-caretaking statute falls within one of the exceptions to the warrant requirement, the fact that that action was authorized by ORS 133.033 is irrelevant if the action violated a defendant's constitutional rights. Accordingly, we consider first whether the officer's action in this case falls within the emergency-aid exception to the warrant requirement before considering whether it was authorized by ORS 133.033.

The Oregon Supreme Court recently explained in *Baker*, 350 Or at 649, that "an emergency aid exception to the Article I, section 9[,] warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with

suffering, serious physical injury or harm." (Footnote omitted.) We conclude that, under the circumstances of this case, it was not objectively reasonable for Juilfs to believe that defendant had suffered, or was imminently threatened with suffering, serious physical injury or harm such as to justify the warrantless entry of the restroom.

The facts known to Juilfs at the time he directed defendant to come out of the restroom did not demonstrate a need for emergency aid. Over the course of five minutes, Juilfs heard a "constant level of noise" in the restroom, including running water in the sink, throat clearing, and rustling and banging noises. He also testified that the manager had told him that defendant had been in the restroom for 15 minutes before his arrival. Though the manager heard banging and moaning and had called 9-1-1 out of a concern that defendant was ill or needed medical attention, Juilfs did not hear any noises that suggested that defendant was in distress. The noises Juilfs heard sounded like someone using a restroom. They do not support a reasonable belief that defendant was in need of immediate aid or had suffered, or was imminently threatened with suffering, serious physical injury or harm. Indeed, the fact that Juilfs waited five minutes for his backup to arrive and did not attempt to ask defendant about his condition suggests that Juilfs did not believe that defendant's condition or circumstances were such that he required emergency aid. Because a warrantless entry of the restroom would not have been justified by the emergency-aid exception, Juilfs's direction to defendant to step out of the restroom likewise cannot be justified. *See Hudson*, 253 Or App at 342 (explaining that the exigent circumstances in that case would have justified a warrantless entry of the house and so the police's directions to the defendant to exit the house were legally permissible under the warrant exception, even though the officers did not physically enter the house).

In sum, defendant in this case was seized when Juilfs ordered him to exit the restroom. That seizure was not justified by reasonable suspicion; nor were the officer's actions authorized under the emergency-aid exception or, therefore, the community-caretaking statute, ORS 133.033.

Defendant has demonstrated that there is a "but for" relationship between the evidence sought to be suppressed and the illegal seizure: but for the illegal seizure, Juilfs would not have observed defendant's behavior and would not have been authorized to transport him to a detoxification facility, which permitted Juilfs to conduct the inventory search. The state has failed to prove that the evidence sought to be suppressed did not derive from the illegal seizure. *See State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005) (once a defendant has established the existence of a minimal factual nexus between the evidence sought to be suppressed and prior unlawful police conduct, the state is required to prove that the evidence did not derive from the preceding illegality). Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.